## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**PATRICK DELONDA WILLIAMS, JR.,**

      **Plaintiff,**

**vs.**                                           **Case No. 4:13cv605-RH/CAS**

**CAROLYN W. COLVIN, Acting**
**Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned United States Magistrate

Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule

72.2(D).   It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final

determination of the Acting Commissioner (Commissioner) of the Social Security

Administration (SSA) denying Plaintiff's application for Supplemental Security Income

(SSI) under Title XVI of the Act.   After careful consideration of the record, it is

recommended that the decision of the Commissioner be affirmed.

Case No. 4:13cv605-RH/CAS

### I.  Procedural History

On March 8, 2010, an application for SSI benefits was filed on behalf of Plaintiff, Patrick Delonda Williams, Jr., who was then a minor child under the age of 18, defined as an adolescent (age 12 to attainment of age 18), *see* 20 C.F.R. § 416.926a(g)(2)(v).   R. 28, 161.   (Citations to the Record shall be by the symbol R. followed by a page number that appears in the lower right corner.)   Plaintiff alleged he had been under a disability since December 15, 2009, the date that his mother brought him to the hospital, having been in a fight at school and having pushed his grandmother to the floor, but later did not remember anything.   His mother was concerned he might hurt himself or others.   R. 302-03, 332.   The claim was initially denied on May 12, 2010, and upon reconsideration on October 5, 2010.   R. 28, 94-114, 217-18.   On November 15, 2010, a timely request for hearing was filed.   R. 28, 117-24.   On May 23, 2011, Plaintiff attained the age of 18 prior to the Administrative Law Judge's (ALJ) hearing and decision in this case.   R. 32; *see* 20 C.F.R. § 416.120(c)(4) ("An individual attains a given age on the first moment of the day preceding the anniversary of his birth corresponding to such age.").

On November 10, 2011, a hearing was conducted by the Administrative Law Judge (ALJ) Stacy Paddack.   R. 28, 48-93.   Plaintiff was represented by James Kole, an attorney.   R. 28, 50, 115-16.   Prior to commencing the evidentiary portion of the hearing,

the ALJ noted the record lacked school records and asked Plaintiff's counsel if he intended to submit a medical source statement from the treating specialist.   R. 53-55. Counsel stated that the request had been refused by Plaintiff's treating psychiatrist.   *Id.* The ALJ stated that she would send Plaintiff for a consultative evaluation after the hearing.   R. 86-87.   In November 2011, Plaintiff's treating psychiatrist, Melody S. Agbunag, M.D., *see infra* n.3, completed a Medical Residual Functional Capacity Checklist.   R. 457-59.   At the request of the ALJ, in December 2011, Marie Hume Guilford, Ph.D., a licensed clinical psychologist, performed a consultative examination of Plaintiff to evaluate his mental status and submitted her report to the ALJ.   R. 516-23; *see infra* at 19-21.   Plaintiff testified during the hearing.   R. 57-88, 90.   Ron C. Mayne testified as an impartial vocational expert.   R. 28, 88-92, 150-51 (Resume).

On June 1, 2012, the ALJ entered her decision and determined that Plaintiff was not disabled.   R. 28-43.   On August 8, 2013, the Appeals Council denied Plaintiff's request for review and the decision of the ALJ stands as the final decision of the Commission.   R. 6-15, 23-24; *see* 20 C.F.R. § 416.1481.   On October 11, 2013, Plaintiff's counsel requested an extension of time to file a civil action that was granted. R. 1-5.   On October 30, 2013, Plaintiff filed a Complaint in this Court and both parties filed memoranda of law, which have been considered.   Docs. 15 & 16.

Case No. 4:13cv605-RH/CAS

## II.  General Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).   "Substantial evidence is more than a scintilla, but less than a preponderance.   It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).   "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).   "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).   The Court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). The reviewing court is not free to reweigh the evidence or substitute its judgment for that of the Commissioner.  Bloodsworth, 703 F.2d at 1239.   "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.   A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence

relied on by the ALJ."   Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

"Unless the Secretary has analyzed all evidence and has sufficiently explained the weight

he has given to obviously probative exhibits, to say that his decision is supported by

substantial evidence approaches an abdication of the court's 'duty to scrutinize the record

as a whole to determine whether the conclusions reached are rational.'"   Cowart v.

Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

### III.   Findings of the ALJ

#### A.   Introduction

Plaintiff contends that he became disabled on December 15, 2009, when he was

16 years old.   Plaintiff was also 16 years old when he filed his SSI application on March

8, 2010.   R. 32.   Plaintiff attained the age of 18 on May 23, 2011.   The ALJ decided the

case on June 1, 2012, when Plaintiff was 19 years old.   The ALJ made two sets of

findings based on Plaintiff's age *before* attaining the age of 18, R. 33-40, and *after*, R.

40-43.

#### B.   Criteria for Persons under the Age of 18

For persons under the age of 18, a claimant must show "a medically determinable

physical or mental impairment, which results in marked and severe functional limitations,

and which . . . can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 1382c(a)(3)(C)(i); 20 C.F.R. § 416.924.

A child's claim for supplemental security income benefits is analyzed by following

the rules set forth in 20 C.F.R. § 416.924, et seq.   The Commissioner "will consider the

combined effects of all [the child's] impairments upon [the child's] overall health and functioning," and is to evaluate "any limitations in [the child's] functioning that result from . . . symptoms, including pain."   20 C.F.R. § 416.924(a).   The claim is to be evaluated in three steps:

1.   Is the child currently engaged in substantial gainful activity?

2.   Does the child have any severe impairments?

3.   Does the child have any severe impairments that meet, are medically equal to, or functionally equal in severity to, an impairment listed in Appendix 1 of 20 C.F.R. Part 404?

20 C.F.R. §§ 416.924(a)-(d).

At step two, the claimant's "physical and mental impairments(s)" are considered to determine if the claimant has "an impairment or combination of impairments that is severe."   20 C.F.R. § 416.924(a).   The claim is denied at step two if the child does not have a severe impairment.   A "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations" is not a "severe impairment."   20 C.F.R. § 416.924(c).

At step three, the issue of whether the impairment meets or equals a listed impairment is the same as for evaluation of an adult claim.   If the impairment neither meets nor equals a listed impairment, the Commissioner must next determine whether the impairment is functionally equal in severity to a listed impairment.   20 C.F.R. § 416.924(a).   This step is unique to child supplemental security income disability claims. There is no "residual functional capacity" determination, and no determination of ability to perform work.

"In determining whether a child's impairment functionally equals a listing, the regulations require consideration of 'six domains,' which are 'broad areas of functioning intended to capture all of what a child can and cannot do.'"   <u>Gibbs v. Barnhart</u>, 130 F. App'x. 426, 429 (11th Cir. 2005) (citation omitted).

As to functional equivalency, the regulations provide:

> If you have a severe impairment or combination of impairments that does not meet or medically equal any listing, we will decide whether it results in limitations that functionally equal the listings.   By "functionally equal the listings," we mean that your impairment(s) must be of listing-level severity; i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain, as explained in this section.

20 C.F.R. § 416.926a(a); *see* 20 C.F.R. § 416.926a(d).   The domains are:

> (i)      Acquiring and using information;
>
> (ii)     Attending and completing tasks;
>
> (iii)    Interacting and relating with others;
>
> (iv)     Moving about and manipulating objects;
>
> (v)      Caring for yourself; and,
>
> (vi)     Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i) – (vi).

"[A] 'marked' limitation in a domain [will be found] when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities."   20 C.F.R. § 416.926a(e)(2)(i).   It "means a limitation that is 'more than moderate' but 'less than extreme.'"   *Id*.

> If you are a child of any age (birth to the attainment of age 18), we will find that you have a "marked" limitation when you have a valid score that is two

standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

20 C.F.R. § 416.926a(e)(2)(iii).

"[A]n 'extreme' limitation in a domain [will be found] when your impairment(s)

interferes *very* seriously with your ability to independently initiate, sustain, or complete

activities."   20 C.F.R. § 416.926a(e)(3)(i) (emphasis added).

If you are a child of any age (birth to the attainment of age 18), we will find that you have an "extreme" limitation when you have a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

20 C.F.R. § 416.926a(e)(3)(iii).

## C.   The ALJ's Findings (prior to attaining age of 18)

1.  "The claimant has not engaged in substantial gainful activity since the date the application was filed."  R. 32.

2.  "Before attaining age 18, the claimant had the following severe impairments: schizoaffective disorder and psychotic disorder."   R. 33.

3.  "Before attaining age 18, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, Part A or B." R. 33.   The ALJ considered Plaintiff's impairments under each of the Listing of Impairments (Listing 112.00) and specifically found that the requirements of Listing 112.03 (schizophrenic, delusional (paranoid), schizoaffective, and other psychotic disorders) were not satisfied.   *Id.*

4.  "Before attaining the age of 18, the claimant did not have an impairment or combination of impairments that functionally equaled the listings (20 CFR 416.924(d) and 416.926a)."   R. 33.   In terms of the six functional equivalence domains listed in 20 C.F.R. § 416.926a(b)(1)(i)-(vi), the ALJ determined that Plaintiff "had *no* limitation in acquiring and using information," R. 35; "*less than*

*marked* limitation in attending and completing tasks," R. 35; "*less than marked* limitations in interacting and relating with others, R. 37; "*no* limitations in moving about and manipulating objects, R. 38; *no* limitations in the ability to care for himself, R. 39; and *no* limitations in health and physical well-being, *id*. The ALJ concluded that Plaintiff was not disabled before attaining age 18 because Plaintiff "did not have an impairment or combination of impairments that met, medically equaled any listing or functionally equaled the listings."   R. 40.

### D.   Criteria for Persons over the Age of 18

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 423(d)(2)(A).   A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002).

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'"   Bloodsworth, 703 F.2d at 1240 (citations omitted).

Unlike the above analysis involving a child or adolescent, the Commissioner

analyzes an adult's claim in five steps.   20 C.F.R. § 416.920(a)(4)(i)-(v).

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[1]

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.   A positive finding at step three results in approval of the application for benefits.   At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.   Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.   If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.   Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen,

---

[1]   A residual functional capacity (RFC) is the most a claimant can still do despite limitations.   20 C.F.R. § 416.945(a)(1).   It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records. Id.   The responsibility for determining claimant's RFC lies with the ALJ.   20 C.F.R. § 416.946(c).

786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R.

§ 416.920(a)(4)(v), (e) & (g).   If the Commissioner carries this burden, the claimant must

prove that he or she cannot perform the work suggested by the Commissioner.   <u>Hale v.</u>

<u>Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987).

### E.   The ALJ's Findings (after attaining age of 18)

1.   "The claimant has not developed any new impairment or impairments since attaining age 18."   R. 40.

2.   "Since attaining age 18, the claimant has continued to have a severe impairment or combination of impairments."   *Id.*

3.   "Since attaining age 18, the claimant has not had an impairment or combination of impairments that meets or medically equals a listed impairment." *Id.*   The ALJ considered Plaintiff's impairments under the Listing of Impairments and particularly Listing 12.03 ((schizophrenic, delusional (paranoid), schizoaffective, and other psychotic disorders) pertaining to adults.   *Id.*

4.   "[S]ince attaining age 18, the claimant has had the residual functional capacity [RFC] to perform a full range of work at all exertional levels but with the following non-exertional limitations: he may perform simple, routine and repetitive tasks and he may have occasional interaction with the public, co-workers and supervisors." R. 41.

5.   "The claimant has no past relevant work."   R. 42.

6.   "The claimant is currently a "younger individual age 18-44[.]"   *Id.*   "The claimant has a limited education and is able to communicate in English."   *Id.*

7.   "Since attaining age 18, considering the claimant's age, education, work experience, and [RFC], jobs have existed in significant numbers in the national economy that the claimant has been able to perform."   *Id.*   The ALJ considered that Plaintiff's ability to perform work at all exertional levels has been compromised by nonexertional limitations.   *Id.*   To this end, the ALJ relied on the vocational expert who, after considering several factors, R. 90-91, testified that Plaintiff (as the hypothetical person) would be able to perform several jobs including that of laundry worker, a medium job with an SVP of 2; common area cleaner, a light job

with an SVP of 2; and assembler of small products, a light job, with an SVP of 2.[2]
R. 42.

8.   "The claimant has not been under a disability, as defined in the Social Security
Act, since May 23, 2011, the day the claimant attained age 18, through the date of"
the ALJ's decision.   R. 43.

## IV.   Relevant Medical and Other Evidence; ALJ's Credibility Findings

### A.   Introduction

Plaintiff does not find fault with ALJ's recitation of the evidence.   Doc 15.   Rather,

Plaintiff disagrees with the weight given to Dr. Agbunag's, who works at Apalachee

Center, Inc. (Apalachee).[3]   Doc. 15 at 5-7.   Plaintiff visited with

Dr. Agbunag from December 2009 through November 2011 and the patient notes are

discussed below.   Most of the visits lasted approximately 15 minutes and were for

medication management.   In November 2011, and after the evidentiary hearing,

Dr. Agbunag completed a medical source statement and opined Plaintiff had marked to

extreme limitations in his social interactions, concentration and adaptation skills.   The

---

[2]   The ALJ asked the vocational expert to assume the following: "Assume an
individual of the claimant's age, education, and work experience who is able to able to
[sic] perform work at all exertional levels.   And who would need work that is limited to
simple, routine, and repetitive tasks.   Who would only have occasional interaction with
the public, only occasional interaction with co-workers, and only occasional interaction
with supervisors.   What jobs might be appropriate for such an individual?"   R. 90.   The
ALJ was told that Plaintiff had no past relevant work or any work.   *Id.*

[3]   The medical and other evidence presented to the ALJ is set forth in the ALJ's
decision at pages 34 through 41 and is incorporated by reference herein.   Further, the
ALJ refers to this doctor as Melody S. Agburng, M.D.   R. 41.   Plaintiff and the
Commissioner refer to this doctor as Dr. Agbunay in their memoranda.   Docs.15 at 5 and
16 at 5.   The doctor's name and signature are not legible.   *See, e.g.,* R. 459.   The
Florida Board of Medicine website, under license verification for medical doctors, lists
Melody Anne Santos Agbunag and working at Apalachee Center Incorporated in
Tallahassee, Florida.   The doctor shall be referred to herein as Dr. Agbunag.

ALJ determined that this opinion was inconsistent with her corresponding November

2011 treatment notes and the December 2011 consultative examination findings of

Dr. Guilford.   R. 41.   Plaintiff argues the ALJ erred when he gave limited weight to

Dr. Agbunag's medical source opinion.   Doc. 15 at 5-7.

### B.   Relevant Medical and Other Evidence

Plaintiff sought treatment at Apalachee from 2009 through 2010, "during which

time he reported experiencing visual and auditory hallucinations, hopelessness,

depression and a history of suicidal ideations (Ex. 3F48, 3F53-55, 4F, 6F, 12F, 13F)."   R.

34.   As noted by the ALJ,

> [o]n December 15, 2009, he was admitted [to Eastside Psychiatric Hospital,
> R. 299, 302, 405] for psychiatric evaluation due to these complaints (Ex. 3F35).
> [Plaintiff was 16 years old.   R. 299.]   He appeared worried, but remained
> well-oriented with organized thought processes and average memory and
> intellectual functioning (Ex. 3F37).   He was diagnosed with psychosis and
> assessed as having a global assessment of functioning (GAF) score of 50 (Ex.
> 3F38).   However, at that time, he was not taking any medications.[4]

---

4   The American Psychiatric Association: *Diagnostic and Statistical Manual of
Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF scale that
is primarily used by mental health practitioners.   The GAF Scale is used to report "the
clinician's judgment of the individual's overall level of functioning" (with regard to only
psychological, social, and occupational functioning) and "may be particularly useful in
tracking the clinical progress of individuals in global terms, using a single measure."   *See*
DSM-IV-TR 32-34.   The GAF scale is divided into 10 ranges of functioning, each with a
10-point range in the GAF scale.   *Id.*   *See* Nichols v. Astrue, Case No.
3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012)
(discussing GAF scale).   A score of 21-30 refers to behavior that "is considerable
influenced by delusions or hallucinations OR serious impairments in communication or
judgment   . . . OR inability to function in almost all areas."   DSM-IV-TR 34.   A score of
31-40 is defined as manifesting "[s]ome impairment in realty testing or communication
(e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several
areas, such as work or school, family relations, judgment, thinking, or mood."   *Id.*   A
GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in
social, occupational or school functioning.   *Id.*   A GAF scale rating of 51 to 60 indicates

The claimant began taking Zyprexa and within 2 days, he denied experiencing any paranoia, hallucinations, thought preoccupations or medication side effects (Ex. 3F29).   Accordingly, he was discharged just two days after being admitted with an improved GAF score of 65 (Ex. 3F29) [footnote omitted].   His June-August 2010 treatment notes show that he was well-oriented with linear an appropriate thought processes and content, no hallucinations or suicidal ideations, intact recent and remote memory, good insight and judgment (Ex.9F12, 9F18).

R. 34-35.   Sergio Balcazar, M.D., wrote a discharge summary, noting that Plaintiff was

improved; had no auditory hallucinations; no delusions; no thought disorganization; no

acute distress; and no signs of medication side effects.   R. 303, 406.   He noted

"[p]otential noncompliance with medications."   *Id.*   His recommendation for future

treatment included "[c]ompliance with medications and appointments and avoidance of

any addictive substances."   *Id.*

It appears that Plaintiff first visited with Dr. Agbunag in December 2009 at

Apalachee.   R. 56, 299.   On December 29, 2009, Dr. Agbunag gave a provisional

---

moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*   A GAF scale rating of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and has some meaningful interpersonal relationships.   *Id.*

The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"   Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).   In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (5th ed. 2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.   In order to provide a global measure of disability, the WHO Disability Assessment Schedule (WHODAS) is included, for further study, in Section III of DSM-5 (see the chapter "Assessment Measures")."   DSM-5 at 16; *see* Finley v. Colvin, Civil Action No. 3:12-7908, 2013 WL 6384355, at *23 n.9 (S.D. W.Va. Dec. 5, 2013) ("It should be noted that in the latest edition of the [DSM], the GAF scale was abandoned as a measurement tool.").

diagnosis of psychotic disorder, NOS.   The clinical impressions were that Plaintiff "may be mentally retarded.   The client was delayed in speech and reaction."   Dr. Agbunag recommended Plaintiff be evaluated by a children's psychiatrist.   R. 300.   Plaintiff was prescribed Risperdine.   R. 393.   (There is no finding in the record that Plaintiff is mentally retarded.   *See generally* R. 521-23 (Dr. Guilford's analysis of test scores).)

On January 26, 2010, Plaintiff had a psychiatric evaluation by Dr. Agbunag. R. 285.   The mental status exam appears normal and there were no risk factors noted. The diagnosis was psychosis, unspecified.   R. 287-88, 479.   Plaintiff was prescribed Zyprexa.   R. 289.   On February 19, 2010, Plaintiff was provided with a client service plan.   R. 371.   On February 23, 2010, Plaintiff met with Dr. Agbunag for a medication management visit (the first of many that are summarized below) that lasted 15 minutes. Plaintiff was to taper off Zyprexa and prescribed Trilafon.   The mental status exam was normal.   R. 289, 385, 482.   The Axis I primary diagnosis remained as psychosis, unspecified.   R. 482.   On March 23, 2010, Plaintiff was to decrease Trilafon and take Zyprexa.   R. 289, 473.   The primary diagnosis remained the same.   The mental status exam was normal, except "paranoid" was checked under thought content. R. 473.   On April 20, 2010, the primary diagnosis remained the same and the mental status exam was normal, except "hallucinations" was checked under thought content.   A note states that Plaintiff "was doing very well on Zyprexa."   R. 486.[5]

---

[5]   On April 30, 2010, Patricia Boger, Ph.D., completed a Childhood Disability Evaluation Form.   R. 334-39.   Dr. Boger opined for the domain evaluations that Plaintiff had no limitation in acquiring and using information and caring for himself and less than marked limitation in attending and completing tasks and interacting with others.   R.

On May 18, 2010, Dr. Agbunag's primary diagnosis remained the same and the mental status exam was normal, except "auditory" was checked under thought content. R. 488.   On June 22, 2010, Plaintiff reported no longer hearing voices, sleeping well, and tolerating Zyprexa without side effects.   The primary diagnosis remained the same and the mental status exam was normal.   R. 490.   On August 17, 2010, Plaintiff reported sleeping good and not hearing voices.   The mental status exam was normal.   R. 469.[6]

On October 19, 2010, Plaintiff reported to Dr. Agbunag that he was sleeping good, not hearing voices, although "suicidal" and "contracts for no self-harm" are checked under thought content.   Otherwise, the mental status exam was normal.   He was continued on Zyprexa and the primary diagnosis remained the same.   R. 373.   On December 7, 2010, Plaintiff reported no hallucinations, no behavior problems in school, still planning to graduate from high school in June but unsure.   R. 496.   The mental status exam was normal and the primary diagnosis remained the same.   *Id.*

---

336-37.   As a result, she found that Plaintiff had no impairment or combination of impairments that functionally equal the listings.   R. 338.   Dr. Boger explained her findings, which consisted of a review of a psychiatric evaluation from December 2009, a March 2010 note from Dr. Agbunag, and reports from his mother and school, and some other information.   R. 339.   The ALJ referred to Dr. Boger's opinion when she considered several of the six domains of function.   R. 36-37, 39.

[6]   On October 10, 2010, Jane Cormier, Ph.D., completed a Childhood Disability Evaluation form.   R. 355-60.   Dr. Cormier opined for the six domain evaluations that Plaintiff had no limitation in acquiring and using information, moving about and manipulating objects, caring for himself, and health and physical well-being and less than marked limitation in attending and completing tasks and interacting with others.   R. 357-58.   Dr. Cormier offered an explanation under the first three categories, acquiring and using information, attending and completing tasks, and interacting and relating with others.   R. 357-58.   As a result, she also found that Plaintiff had no impairment or combination of impairments that functionally equal the listings.   R. 355.   The ALJ relied on Dr. Cormier's opinions when considering the six functional domains.   R. 36-40.

On March 1, 2011, Plaintiff reported planning to graduate in June, no hallucinations, no behavior problems in school, and no side effects from medication.   R. 466.   The mental status exam was normal and the primary diagnosis remained the same.   *Id*.   Plaintiff turned 18 on May 23, 2011.   R. 41.   On May 24, 2011, Plaintiff reported trying to finish high school.[7]   R. 465.   The mental status exam was normal, except there is a note that he has anger problems at times.   *Id*.   The primary diagnosis was psychosis, unspecified, resolving anger problems.   *Id*.   On August 16, 2011, Plaintiff is still in the 12th grade.   He is not hearing voices and his anger problems are getting better.   The mental status exam was normal and the primary diagnosis was psychotic disorder, NOS unspecified.   R. 502.

The evidentiary hearing was held in this case on November 10, 2011.   R. 48. The ALJ was informed that Plaintiff's treating psychiatrist, presumably Dr. Agbunag, would not provide an assessment regarding his condition.   An appointment was to be made.   R. 53-55, 57, 92.

On November 15, 2011, Plaintiff reported to Dr. Agbunag that he was not hearing voices and had some difficulty sleeping some nights.   R. 504.   The mental status exam was normal, except "obsessions" is checked under thought content.   *Id*.   The primary diagnosis is psychotic, unspecified.   *Id*.   There are some hand written notes that state Plaintiff was seeing someone for anger problems; no side effects from medication; patient

---

[7]   Plaintiff started attending DBIA in March 2010.   R. 61-67, 82-83, 520.   He testified that he wanted to graduate in May, but had to do some more coursework.   It is a computer-based program, but he physically attends school.   *Id*.   Plaintiff explained what happened to him while attending prior schools and the reasons why he left his prior schools.   *Id*.

doing well with medication; and without medications, there would most likely be a recurrence of the auditory hallucinations.   R. 503.   Another note states that he sleeps well on the weekends; doing fine in school; no side effects.

R. 505.   Plaintiff testified he is doing well on medications.   R. 69-70, 84.

On November 16, 2011, Dr. Agbunag completed a Mental Residual Functional Capacity Checklist.   R. 457-59; *see* R. 41.   Under social interaction, Dr. Agbunag checked "marked" under "[e]stimated impairment of ability to accept instruction from or respond appropriately to criticism from supervisors or superiors" and "moderate" in three other categories.   R. 457.   Dr. Agbunag noted that her above answers would change if only minimal contact or interaction with others is required and further noted: "works better in small groups or individually."   *Id.*   Under the category sustained concentration or persistence, Dr. Agbunag checked "marked" for four categories and "moderate" for two. R. 457-58.   Under the category adaption, she checked "extreme" for "[e]stimated impairment of ability to respond appropriately in work setting" and "[e]stimated impairment of ability to tolerate customary work pressures."   R. 458.   She checked "marked" under another category, "none" under two categories, and "moderate" for another.   *Id.*   Dr. Agbunag checked "yes" to the question "[i]s the patient's condition likely to deteriorate if he/she is place under stress, particularly that of a job?"   *Id.*   She further noted: "stress and change affect clients ability to focus and adapt to change."   *Id.*

Dr. Agbunag concluded (checked) that Plaintiff was capable of managing his own funds, but his impairment lasted or is expected to last 12 months or more.[8]   R. 459.

On December 12, 2011, and after the hearing, Plaintiff was evaluated by Dr. Guilford.   R. 516-23; *see* R. 41.   The ALJ referred Plaintiff for a general clinical evaluation with mental status and general intellectual evaluation.   R. 519.   "This evaluation is a consultative examination intended to provide ODD with additional information and objective data regarding the allegations and to determine the nature and extent of any psychiatric/cognitive problems in order to assist ODD in determining eligibility for benefits."   *Id.*   Dr. Guilford reviewed records from Apalachee.   R. 523.

Dr. Guilford provided her general observations of Plaintiff such that his appearance was within normal limits and "[h]is behavior was entirely appropriate throughout the evaluation and time in the office."   R. 519.   Plaintiff was "an adequate informant."   *Id.*   Plaintiff provided a history of his complaints.   R. 519-20.   Background information and daily functioning are described.   R. 520.   Dr. Guilford provided a current mental status:

> Patrick was alert and oriented to person, place, time and purpose.   He was able to relate his history in a coherent manner.   His speech was clear and understandable.   His communication and social skills were adequate.   He did not appear to have significant difficulty with hearing normal conversational speech or responding adequately.   He made adequate eye contact and related well with the evaluator.   His mood and affect were flat.   The only noticeable symptom was him shaking his leg.   He is not currently suicidal.   His thoughts were organized and he related in a coherent manner.   He displayed no loose associations.   There is no

---

[8]   The ALJ considered Dr. Agbunag's opinion in the medical source statement, but concluded: "Because Dr. [Agbunag's] opinion is irreconcilably inconsistent with the claimant's corresponding November 2011 treatment notes and December 2011 consultative examination findings, I afford this opinion little weight (Ex. 15B)."   R. 41.

> evidence of psychosis.   He reports a history of hallucinations that are somewhat
> controlled with medication.   He appears to have a low average intellectual
> functioning.   His memory for recent and remote information appears adequate.
> His attention and concentration were fair.   His insight and judgment appeared
> adequate.

R. 520-21.   Behavioral observations were noted: "During testing, Patrick was on task and

appropriately responsive to instructions.   There were no obvious impairments in

attention or concentration.   He appeared motivated to do his best.   There were no

problems with vision or hearing.   His alleged impairments were not a significant obstacle

to testing.   As a result the findings appear valid."   R. 521.   Plaintiff was administered

the Wechsler Adult Intelligence Scale and Dr. Guilford provided an interpretation of

Plaintiff's test scores.   R. 521-23.   Dr. Guilford's clinical impression was schizoaffective

disorder, depressive type, and guarded prognosis.   R. 523.   She opined that Plaintiff

"may benefit from having funds managed for him by another party."   *Id.*   Dr. Guilford

completed a Medical Source Statement of Ability to do Work-related Activities (Mental).

R. 516-18.   Dr. Guilford opined that Plaintiff was *moderately* affected by his impairment

in his ability to understand and remember complex instructions, to carry out complex

instructions, and the ability to make judgments on complex work-related decisions.   R.

516.   He was *mildly* affected on his ability to make judgments on simple work-related

decisions, and *not* affected regarding his ability to understand and remember simple

instruction and carry out simple instructions.   *Id.*   A note states: "Psychosis-some

confusion.   Problems coping with stress."   *Id.*   He was *moderately* affected by his

impairment in his ability to interact appropriately with the public, supervisor(s),

co-workers, and in his ability to respond appropriately to usual situations and to changes

in a routine work setting.   R. 517.   A note states:   "Depending on the situation-he can probably function okay but only for short periods.   Extended contact with others is likely to increase symptoms."   *Id.*   No other capabilities were affected by the impairment.   *Id.* Finally, Dr. Guilford opined that he cannot manage benefits in his own best interest noting: "Questionable.   Probably best to have someone else manage benefits."   R. 518.

The ALJ summarized Dr. Guilford's findings:

During a December 2011 consultative examination with licensed clinical psychologist Marie Hume Guilford, Ph.D., the claimant was well-oriented with organize thoughts, clear speech, adequate social skills, and adequate recent and remote memory (Ex. 15F).   He did not exhibit any signs of psychosis or loosened associations (Ex. 15F7).   His Wechsler Adult Intelligence Scale-IV full scale IQ score was 78 (Ex. 15F).   Based upon this examination of the claimant and review of his records, Dr. Guilford opined that the claimant had moderate limitations in his ability to understand, remember and carry out instructions and moderate limitations in his ability to interact appropriately with others.   Because Dr. Guilford had an opportunity to personally examine the claimant and to render an opinion within her field of expertise, and because Dr. Guilford's opinion is fairly consistent with the record as a whole, I afford her opinion significant weight.

R. 41.

## C.   The ALJ's Credibility Findings

The ALJ also made the following credibility findings:

As for the issue of the claimant's credibility, I note that his statements are internally inconsistent, a finding which tends to suggest that his allegations of disabling symptoms are less than credible.   The claimant has not been diagnosed with any severe physical medically determinable impairment, but at the hearing, he denied being able to walk for more than 30 minutes, sit for more than one hour, or climb more than 3 or 4 steps.   He has also alleged experiencing significant mental health disturbances since 2006, but his medical records fail to document any mental health treatment prior to 2009 (Ex. 9F73, 15F9).   In total, he saw Dr. Jones only four times in 2010 and only twice in 2011 (Ex. 10F7) [R. 443].   This scarcity of treatment is simply inconsistent with the claimant's allegations of disabling impairments.

*Id.*

## V.  Legal Analysis

Plaintiff does not find fault with ALJ's recitation of the evidence.    Doc 15.    Rather, Plaintiff disagrees with the weight given to the opinion of Dr. Agbunag, a treating psychiatrist, who works at Apalachee.   Doc. 15 at 5-7.   Plaintiff visited with Dr. Agbunag from December 2009 through November 2011 and the patient notes are discussed below.   Most of the visits lasted approximately 15 minutes and were for medication management.   In November 2011, and after the evidentiary hearing, Dr. Agbunag completed a medical source statement and opined Plaintiff had marked to extreme limitations in his social interactions, concentration and adaptation skills.   The ALJ determined that this opinion was inconsistent with the doctor's corresponding November 2011 treatment notes and the December 2011 consultative examination findings of Dr. Guilford.   R. 41.   Plaintiff argues the ALJ erred when he gave limited weight to Dr. Agbunag's medical source opinion.   Doc. 15 at 5-7.

As the finder of fact, the ALJ is charged with the duty to evaluate all of the medical opinions of the record resolving conflicts that might appear.   20 C.F.R. § 416.927.   When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, i.e., "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion

is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors.   20 C.F.R. § 416.927(b) & (c).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.   Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).   This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."   20 C.F.R. § 416.927(c)(2).   "This requires a relationship of both duration and frequency."   Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).   "'The treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.'   *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (emphasis added)."   *Id.*

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.   Phillips, 357 F.3d at 1241.   "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."   MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).   Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so.   Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).   Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence."   Lewis, 125 F.3d at 1440; Edwards, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).   Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments.   Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

Plaintiff visited with Dr. Agbunag (the only relevant treating source, R. 56) from December 2009 through November 2011.   For the most part, these visits were approximately 15 minutes in length and for medication management.   Dr. Agbunag consistently opined that Plaintiff suffered from a psychotic disorder, NOS.   Most of the mental status exams were normal except where noted herein.   Plaintiff was prescribed medication and appears to have done well with Zyprexa and without side effects.

Throughout this time, Plaintiff continued in high school.    Plaintiff reported anger

problems from time to time, but they seem to have been under control as of August 2011,

*see* R. 502, and Plaintiff was seeing someone for anger problems.    R. 503.    In

November 2011, Dr. Agbunag's notes reveal more of the same-no side effects from

medication; patient doing well with medication; and doing fine in school.    R. 503.

It was not until Dr. Agbunag completed the November 2011 Mental Residual

Functional Capacity Checklist that Dr. Agbunag opined that Plaintiff was essentially

disabled, checking that Plaintiff had marked to extreme limitations in his social

interactions, concentration, and adaptation skills.    R. 41, 457-59.    The ALJ noted her

opinion, but determined that her "opinion was irreconcilably inconsistent with the

claimant's corresponding November 2011 treatment notes and December 2011

examination findings" of Dr. Guilford.[9]    R. 41.    Dr. Agbunag's opinion is also inconsistent

with her prior medication management patient notes discussed herein.

Further, in December 2011, Dr. Guilford conducted a consultative examination

almost contemporaneously with Dr. Agbunag's November 2011 opinion.    R. 516-23.

Plaintiff argues that Dr. Guilford's opinion is internally inconsistent and based upon only a

single examination of Plaintiff and, as a result, there is good cause to discredit her

---

[9]    Without support from the medical records, such forms are generally not entitled
to significant weight.    *See* <u>Teague v. Astrue</u>, 638 F.3d 611, 615 (8th Cir. 2011) ("Given
that the 'check-off form' did not cite any clinical test results or findings and
Dr. Lowder's previous treatment notes did not report any significant limitations due to
back pain, the ALJ found that the MSS was entitled to 'little evidentiary weight.'"); <u>Dixon v.
Astrue</u>, No. 5:09-cv-320-RS-EMT, 2010 U.S. Dist. LEXIS 125831, 2010 WL 4942141, at
*14-15 (N.D. Fla. Oct. 26, 2010) (explaining that ALJ properly rejected opinions
expressed by treating physician on "check-off" type forms where treating physician's own
treatment notes did not support opinions expressed on those forms).

opinion.   Doc. 15 at 7.   Dr. Guilford opined that Plaintiff was *moderately* affected by his

impairment in his ability to understand and remember complex instructions, to carry out

complex instructions, and the ability to make judgments on complex work-related

decisions.   R. 516.   He was *mildly* affected on his ability to make judgments on

simple-work-related decisions, and *not* affected regarding his ability to understand and

remember simple instruction and carry out simple instructions.   *Id.*   A note states:

"Psychosis-some confusion.   Problems coping with stress."   *Id.*   He was *moderately*

affected by his impairment in his ability to interact appropriately with the public,

supervisor(s), co-workers, and in his ability to respond appropriately to usual situations

and to changes in a routine work setting.   R. 517.   A note states: "Depending on the

situation-he can probably function okay but only for short periods.   Extended contact with

others is likely to increase symptoms."   *Id.*   No other capabilities were affected by the

impairment.   *Id.*   The ALJ gave Dr. Guilford's opinion "significant weight."   R. 41.

     During the hearing, Plaintiff testified that his problem was "getting along with

people."   R. 84-86.   Dr. Agbunag opined that Plaintiff "works better in small groups or

individually."   R. 457.   Dr. Guilford noted that Plaintiff is able to relate to relate to others,

but tends to avoid people because he feels more comfortable doing so.   R. 520.   In

determining Plaintiff's RFC, the ALJ found that Plaintiff had non-exertional limitations

such that "he may perform simple, routine and repetitive tasks and he may have

occasional interaction with the public, co-workers and supervisors."   R. 41.   The ALJ

relied on the vocational expert who, after considering several factors, R. 90-91, testified

that Plaintiff (as the hypothetical person) would be able to perform several jobs including

that of laundry worker, a medium job with an SVP of 2; common area cleaner, a light job

with an SVP of 2; and assembler of small products, a light job, with an SVP of 2.[10]   *See*

*supra* n.2.

Substantial evidence supports the ALJ's RFC assessment, the weight given to Dr.

Agbunag's check-off opinion, the weight given to Guilford's opinion, the ALJ's

determination that Plaintiff is able to perform jobs in the national economy in light of his

limitations, and her overall conclusion that Plaintiff is not disabled.

## VI.  Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge

were based upon substantial evidence in the record and she correctly followed the law.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny

Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on May 2, 2014.

**s/   Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

---

[10]   "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."   20 C.F.R. § 416.968(a).   An SVP of 1 means a "[s]hort demonstration only."   Dictionary of Occupational Titles (DOT) (4th Ed., Rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.   An SVP of 2 means "[a]nything beyond short demonstration up to and including 1 month."   *Id.*

## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.   A party may respond to another party's objections within 14 days after being served with a copy thereof.   Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.